Good morning. May it please the Court, Kimberly Weber for Appellant Pension Plan. I would like to reserve three minutes for rebuttal, if I may. Your Honors, we have here today a sophisticated asset acquisition group whose purchase of a unionized hotel triggered the seller's withdrawal liability from the pension plan, leaving behind unfunded vested pension liabilities, as defined by ERISA's MPPAA or MEPA. Unpaid withdrawal liabilities put at risk the hard-earned pensions of the plan's 12,000 members, and it also creates a hardship for the employers who continue to stay in the plan. The Court, having recently affirmed in 2015 that successors can and should be held liable for withdrawals, should today adopt a notice standard that would prevent sellers and buyers from shirking their ERISA obligations. We ask that the Court here today announce a clear standard for notice, reverse the trial court's decision, and remand with clear instructions. Do you concede that they did not have actual notice? Yes, we concede. Okay, so the first then question is whether we apply a constructive notice standard, and then whether there is sufficient constructive notice in this case. Correct, Your Honor. And, you know, I will also say while we concede that there is not actual notice, we would contend that there was implied notice or inferred notice as that standard has been defined by the Seventh Circuit previously. But we believe that the precise and most effective form of notice that is required would be inquiry notice, and we believe that because of the policy, because of the practicality, and also because of the precedent. The policy is very clear. We, as the Court is very familiar, both ERISA and MEPA are remedial statutes that should be broadly construed. Moreover, the practicality is very clear. The Court has the opportunity here to promote fair and healthy business practices and to discourage transactions such as the one here that create an end run around ERISA obligations. Buyers are already in the best position to perform investigations. They're already required to perform due diligence. Here, the buyer knew that there was a pension plan. The buyer knew that the seller could be liable for withdrawal liability, and all that was left was discovering the basic fact that the pension plan was underfunded. Now, discovering that fact is very easy. All the buyer had to do was look up public records. That is as simple as going to the Internet to looking at one of the pension plan databases or at the plan's website. It was as simple as picking up a phone to call the plan, or they could have asked the seller for the annual funding notices, all of which they failed to do, and that failure we consider to be unjustifiable. Meanwhile, requiring the plans to prove actual personal knowledge when they are not party to the sales negotiation is a steep burden. The pension plan did everything that it was required to do. It carefully appraised the funding status each year. It provided the information to the federal government each year. It sent appropriate notices to its members and to the participating employers, including the seller in this case. Yet, the court denied the pension plan any recovery because we could not induce the buyer to confess that they knew a well-known fact, that the plan was underfunded. And this fact was well-known. It is a part of the public record, and as a group, 81% of pension plans were underfunded in 2005. After the 2008 market crash, that number did not get any better. By 2010, it was more likely than not that any pension plan was in fact going to be underfunded. So the question is not really was the buyer on notice that the plan was underfunded. It was underfunded. And the question of how much it was underfunded is not vital to this decision about successor liability. They were on notice. Excuse me. Amstar took over this hotel. Amstar was an experienced hotel operator, wasn't it? That is correct. They were very experienced. It was not new to the notion that there was a plan in existence. That is correct. So your argument is as part of their due diligence, they should have established from various sources that there was an underfunded hotel underfunding issue. Correct. Yes. The buyer was a highly sophisticated purchaser. Right. So then they go out and get legal counsel. And legal counsel says, absent an express assumption of withdrawal liability, you don't have any. How does that play into this case? Well, Your Honor, the Ninth Circuit has already ruled what the legal standard was in 2010 when they received that bad legal advice. And the Ninth Circuit has made clear that at that time, buyers and successors could be held liable for successor liability. I guess my broader question is what role does advice of counsel have in the constructive notice context? In constructive notice, the availability of counsel could be relevant. Certainly the fact that the plan had a four-person due diligence team and had access to legal counsel shows that they had the opportunity to investigate. The fact that this equity plan got bad legal advice, we don't think should interfere and put at risk the pension of 12,000 hotel workers. As a sophisticated actor, they know better than to rely on bad opening a web browser or picking up a phone. Right. But in this particular case, and that's the interesting part, I guess, is that they were likely unnoticed that there was a plan. They were unnoticed that there was a plan. They knew that there was potential withdrawal liability. So they, as part of their due diligence, they asked their attorney, what liability do we have? And the attorney says, you don't have any because there's no provision in the case. What is their duty? Well, at that time, they knew exactly what was ahead of them. And the Seventh Circuit... The advice was, yes, there's potential liability for somebody because contributions haven't been made. But don't worry, you don't have to pay. Yeah. And I... So again, I think that a sophisticated actor cannot hide behind bad legal advice. And the Seventh Circuit faced a very similar situation in Saras v. Man Web. And in that case, the buyers actually wrote a contract provision where it said that they would not be held liable for the pension plan fundings. And so those buyers felt that they were protected by the contract, but the Seventh Circuit simply used that contract as evidence that they were on notice of the liabilities. So that upended their understanding of the contract. It upended what they thought was a safe transaction. And I think what the Seventh Circuit... Was that a case in which it appeared that the parties might have written a contract without the advice of counsel or... No. Were they sophisticated parties also that... I believe in Saras v. Man Web, that was an arm's length negotiation. The court does not go into detail about how sophisticated the actors were, but it did appear that they had knowledge of withdrawal liability. And so they had some level of sophistication. And what we have here is extensive evidence in this record of how very sophisticated the highly sophisticated buyer, when they have all the facts available to them, and they get one piece of bad legal advice, which I, in my personal opinion, was bad legal advice even at the time, given the direction of the Seventh Circuit, given the hand tipping from artistic furniture... Was the legal advice in the form of a written opinion? It was in the form of a written opinion, and it is in the record, Your Honor. So how do you respond to Heavenly Hana's argument that if we adopt a constructive notice standard as you pose, that it essentially imposes strict liability on purchasers? And I would say that this is not a strict liability standard. An inquiry notice standard is just that. It is an inquiry notice standard. It's facts that would lead an ordinarily prudent buyer to investigate further. And the buyer did definitely raise the idea of strict liability, of innocence, but those aren't questions that are relevant to withdrawal liability. Withdrawal liability is a remedial statute, is a remedial provision. There is a punitive provision in intent. That is not the situation for pure withdrawal liability. And what we all need for withdrawal liability is to withdraw. And similarly, this successor liability, as it's been explained in Resilient, should be broadly construed to ensure that buyers and purchasers and sellers do not have an end-run around their ERISA obligations. Now, furthermore, I would also say that it does not take away the plan's obligations in any way. The plan is still obliged to annually appraise the health of their funding. They are still obliged to annually publish. They are under fundings, if any. They are still obliged to provide that actual notice to their employers, including their sellers. So that should be sufficient for any ordinary prudent buyer to investigate further. Do you want to reserve some time? Yes, if I may, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. I am Wendy Coates, counsel for Amstar. I'd first like to start out with the fact that the standard of review and how that plays into this particular case, and that we are post a bench trial with a magistrate judge who, in its decision, detailed very specifically the factual analysis that he engaged in with reaching both questions. First, in finding that there was no evidence of actual notice in this case, as my friend on the other side conceded in that fact. I would say, so actual notice is off the table, and also the question of whether or not your company is a true successor, right? The question of whether they were a true successor was also part of a factual finding by the magistrate judge, correct, which is not part of an argument that we're made at all. So we're down to the questions, as I described them. One is, should we impose a standard of constructive notice, and two, whether this record supports it, right? Right, and Your Honor, we would obviously say no. We don't believe that a constructive notice standard is the correct standard in this case, or any case, for that matter, regarding the successor liability. When you look back to the 45 years following the United States Supreme Court's decision in Golden State Bottling, repeatedly the courts have demonstrated that they're able to work with, and do in fact work with, the notice requirement as announced, and as this Court's resilient floor holding at 1095, when it went ahead and extended successor liability in the withdrawal liability context, it said that it will extend it so long as the buyer takes notice of the liability. And that is something fundamentally different than simply knowing that there were unionized workers, or that there was a pension plan in play. And I think it's very important to recognize that the magistrate court judge here did his job in that regard. He went ahead and said, even if there is, or the Ninth Circuit decides to impose a due diligence requirement that puts a duty and an obligation for the buyer to engage in more questioning, that under the specific facts of this case, Amstart did in fact engage in that due diligence. I would correct the position that was said that Amstart didn't ask. Both the PSA had the warrants and reps that said any notice of underfunding of the plans to have been given. And the facts show that there were no notices of underfunding given from OHANA to Amstart. Similarly, in the record, there's the fact that Amstart's due diligence team did in fact ask the buyer if it knew if the pension plan was underfunded, and it said to its knowledge it was not. Third, Amstart here did in fact have a meeting with the pension plan trustee. And in those conversations, at no point was Amstart made aware that the plan in this particular case was underfunded. And I'd like to address the question of the legal advice, because I think the magistrate judge looked at the fact of the March 10th attorney letter as yet another fact in evaluating whether or not there was an indication that Amstart had notice. And here it found that first, the attorney's letter talked about withdrawal liability generally and the state of the law at that time. There's nothing in that letter to indicate that there was any knowledge that the plan in this particular case was underfunded. And specifically, that letter in March 2010, the resilient floor complaint that then turned into this 2015 case, wasn't even filed until April of 2011. At that point in time, the state of the law had no district court or Ninth Circuit Court of Appeal panel imposing withdrawal liability in this context. And so taking all of those facts together, the magistrate judge looked and said that Amstart did in fact behave diligently and reasonable under those factual circumstances, which brings me to my big concern on why this court shouldn't impose a constructive liability or constructive notice standard. Essentially, you hear from the argument on the other side that a buyer should engage in due diligence, which we did, but that they should do more and do more to ultimately discover the underlying fact for the withdrawal liability. And somehow, if they don't discover it, they're still placed on notice. And the argument goes that if they engage in due diligence, but they don't discover that they didn't do enough and should have done more. Can you tell me about the meeting between Amstart and the trustees? When was that? It was before the close of the sale. So it was between the, it was in the March to May 2010. What was the meeting about? Well, the trustee of the plan was also the president of the union. And so the plan and the union were very aware that Amstar was involved and there was a due diligence sale negotiation plan taking place. So when you met with the president of the union, was that in his capacity as a trustee? Or was that, you're talking about a bargaining session? Well, Your Honor, I think if you look to the supplemental excerpt of the record where we put in the deposition testimony of Mr. Gill, who is the plan's trustee, you'll find that through the supplemental that he, I'm sorry, I just referenced Stebbings, who was our general manager, 276 and 281 and 282, that there were discussions, to some extent, they're trying to keep the union in play, trying to convince Amstar to continue to have the obligations that Ohana had. But at no point in time was there any mention of, in fact, Gill makes the point that he says it didn't occur to him to even put Amstar on notice. They had no discussion about the fund? Correct. Well, we don't know. What we do know is that there was discussions regarding everything with Ohana's union obligations and those relationships, but that there was no notice and no statement made to alert Amstar that the pension fund was underfunded. And that becomes really the trigger point of the factual basis to know whether there would be even contingent liability, which I think is an important distinction when you look at the Tariff Man Web case, that it wasn't simply a reference in the sale agreement there. It would have been very hard to say, for instance, to the union in the bargaining, well, look, you're not only head of the union, you're a trustee. Is there any problem about underfunding? That would have been very easy. Your Honor, I mean, from Amstar's point of view, and the record shows, and in fact, as you walk through the magistrate judge's decision in this regard, he details that Amstar, the facts for Amstar at that point was it had the legal advice that it wasn't going to be on the hook for it. It had asked already the seller if the plan was underfunded, and it had received that to its knowledge it was not. It also had asked for the financial documents. It asked the person or the company it was purchasing from. It didn't ask the union or the fund. Well, and you also have in the record that. But I think it's undisputed that there was no direct inquiry made at the union or the plan as to the funding status, right? And you also have in there is another fact in the record that while this, Amstar has purchased before hotels with this question, and its pattern and practice and habit was to ask the seller and to get and receive the notices and move from that. So in that regard, Amstar wasn't acting out of character. Of the due diligence process, it is typical to engage. This was a relatively quick, you know, looking at about a three to four month negotiation period, evaluation due diligence before the sale in May of 2010. And again, when we look at the magistrate judge, I think this is becomes what's quite important. The magistrate judge here fully understood the balancing of the equities that takes place in the successor liability context and walked through the factual dynamic of whether, in fact, in this particular factual situation, whether holding Amstar liable as a successor was equitable. And when we look at this court's 1995 Steinbeck versus Hubbard decision, we've always looked to the fact that the principle of notice is an ensure of fairness for the buyer. Do you specify what part of the magistrate judge's ruling supports your notion that Amstar did affirmatively ask? Did affirmatively ask? The plan or the seller? About the underfunding? Yes, Your Honor. I mean, the magistrate judge walks through the factual step by step. What are the paragraphs that you're relying on? Your Honor, I don't have that right in front of me here. I can tell you that having read that decision repeatedly that one of the factual considerations that the magistrate judge says that it had spoken with both Marr, I'm not so proud of Marr, the due diligence team of Wolf and Manning, both spoke and asked of Ohana whether the plan was underfunded and both repeatedly communicated that to their knowledge it was not. And with that fact paired with the fact that no notices were given of underfunding, which would corroborate each other. Well, wait a minute. I thought there were public publications that were available to the fact that there had been notices of underfunding. And with the question of actual notice, Your Honor, the magistrate judge also specifically noted that there are no facts in the record to support or suggest that anyone on Amstar's due diligence team accessed or even, one, knew that they were there, or two, even accessed that they were there. This is not one of these cases where the court's. Are they something that are known about generally that plans post those things? Your Honor, I can't speak to the general knowledge that is or isn't in the record. If they were available, if you knew to look for them, you would know there was no secret about them. Well, you're correct, Your Honor, and I think you come back to the factual weighing here that says what was also consistent is receiving no notices of underfunding was consistent with the seller saying that to their knowledge it wasn't underfunded. Right, but I think the question is when we talk about constructive notice in other contexts, the fact that there has been public disclosure somewhere is important, and here you do have a public website that was accessible that did contain the notices, correct? Well, and you're correct, and I think what you also, though, look at, and this goes into the specific facts and balancing that takes place in every successor liability case, that whether it's a Title VII case, we look and say did they have notice of the EEOC charge? You have cases where it's the Labor Standards Acts, and there's a question of did they have notice of the pending litigation? And in all of these cases, we still don't put an affirmative burden and a duty to go out and continue to look for, and I think that's where it becomes an incredibly slippery slope and dangerous proposition. I mean, the fact that the premise is that if there was this duty to do more and they still didn't discover, but they could have discovered that we're going to go ahead and impose even though they don't have notice, and that actually strips out of the successor liability doctrine the principle of fairness and equity that we find as the pivot point of notice, and that if we take that out, we have taken out the very balance of the equities that there are fairness considerations to Amstar, just as there are considerations that are weighed and balanced on the other side, and that the courts for the 45 years since Golden State bottling have had no trouble applying that. And, in fact, you look to the Seventh Circuit that was invited in, I believe it's 1986 in the Wheeler decision, that, yeah, 1986 in the Wheeler decision, when it was invited to make this due diligence requirement, it declined to do so, and the courts have still since been able to successfully, equitably, and fairly manage and apply the successor liability doctrine without creating an additional affirmative burden, and I would invite this court to continue with and follow the resi- one, I believe Resilient Floor actually answered this as an actual notice, that the holding on 1095 of its decision to have notice of the liability is, in fact, an actual notice standard and is consistent with the notice standards in the Title VII cases and the FLSA cases and the LRLA cases, and with that, I would ask this court to affirm, find that actual notice is the standard, but even if it created a due diligence standard, find that the magistrate judge here considered that standard, did his job, evaluated the facts, weighed them, and still found that successor liability was not appropriate and that that was a- that facts were not clearly erroneous and that that was not an abuse of discretion, and, therefore, as a reviewing court, affirmance would be warranted there, as well as affirming the magistrate judge's entry of interest. One question. I just want to make sure, leaving interest aside, what's at stake here, and I gather that your client made four payments totaling $300,000? Yeah, $300,000, $70,000, $72,000, $780,000. And the total claimed leaving side interest is about $757,000? Correct. So that's the difference between those two would be the principal amount in dispute? In dispute, independent of the interest payments on both sides in that regard. Okay.  Thank you. Yes, thank you. I'd first like to address a couple facts that were raised by the argument. First, the district court did find affirmatively that the funding notices were provided by mail, and that is in the record in ER 22. The mailbox rule does apply to ERISA, and that's SHI-CORB, Bank of America Retirement Plan. Second, I would also like to address the idea that the buyer asked for the annual funding notices, and the district court did, or the magistrate judge did make these findings. Again, this is in the decision. It's at the excerpt of records 26, and it's paragraph 45 and paragraph 46. And what these paragraphs show is the purchase-sale agreement, and it says right here, pension plan notices. To seller's knowledge, seller has provided buyer with copies of all notices of default or notices regarding plan funding deficiency. That sounds on its face acceptable until you look at the definition of seller's knowledge. Looking at seller's knowledge, that's section 1.1 or paragraph 46 of the decision, seller's knowledge means, quote, current, actual, not imputed or constructive knowledge, end quote, without independent inquiry, and of three individual people. Then if you skip to that end sentence, you see that seller's knowledge excludes, quote, information or material which may be in the possession of the seller generally or incidentally, but of which the seller's representative is not actually aware, end quote. So what the buyer actually asked the seller in these two paragraphs is, hey, don't look in your mailbox. Don't look in your files. Don't look at your papers. Simply do you recall whether the pension fund is underfunded? This specifically discourages any inquiry. It discourages due diligence, and that's not good enough when 12,000 members' pensions are on the line. And moreover, when looking at where the burden should lie, no court has ever found it appropriate to rely on the sellers to disclose liabilities that would reduce the selling price. Also, I would quickly like to address the trustee meeting. It's unclear exactly when that meeting occurred. Mr. Gill, the union president, was not aware of when the sale actually took place, so he could not tell whether or not the meeting was before or after the sale. Mr. Gill was there, as Judge Reinhart suggested, to discuss representation of the unit members. And it really was another opportunity for the buyer to ask a trustee, is there an underfunding? So we can add that to the list. They could have looked at the public record, they could have gone on the Internet, they could have picked up a phone, they could have asked the trustee who was there before them. Now, the court has already found in MEPA withdrawal liability cases for controlled groups that constructive notice is appropriate. In Allen Transportation Company, the Ninth Circuit found that constructive notice was fair to prevent businesses from shirking their ERISA obligations. And now we ask this court to find that, again, an inquiry notice is appropriate here to prevent and run around these ERISA obligations. Thank you, counsel. Thank you. May I just ask you one question? Judge Reinhart has a question. Judge Thomas asked about the amount involved. Yes. There were claims and counterclaims, and you had received over $300,000. Correct. And the hotel was seeking back that $300,000 plus interest? Correct. And were you not seeking the other $400,000 that was due? We were also, in our counterclaim, we were seeking the full amount of withdrawal liability. Right. I mean, what's at stake is the whole amount of $750,000 plus interest, depending on which way it goes. But for them, it's $300,000. For you, it's about $400,000. Yes. Approximately. Yes. Thank you. Okay. Thank you for your arguments. The cases will be submitted for decision.
judges: Reinhardt, Thomas, Fisher